FELT et al. v. PUGET SOUND ELECTRIC RY.

(Circuit Court, W. D. Washington, W. D.   December 31, 1909.)

No. 1,504.

1. NEW TRIAL (§ 76*)—GROUNDS—EXCESSIVE DAMAGES.

While the amount of damages in an action for death is primarily for the jury, its judgment is neither infallible nor conclusive on motion for new trial on the question as to whether the verdict awarded is excessive.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 153–156; Dec. Dig. § 76.*]

2. DEATH (§ 85*)—DAMAGES—ELEMENTS—LOSS OF SOCIETY.

While loss of decedent's society, protection, and guidance is an element of damage in an action for wrongful death, it is only the pecuniary, and not the sentimental, value thereof for which recovery may be had.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 111; Dec. Dig. § 85.*]

3. DEATH (§ 64*)—EVIDENCE—DAMAGES.

Where, in an action for death of a passenger by the alleged premature starting of an electric car, there was a very strong showing by defendant, not only to negative negligence on its part, but to show negligence by decedent directly contributing to his death, so that the case was a close one as to whether plaintiff could recover at all, such evidence was in the case for all purposes and could be legitimately considered in determining whether the verdict for plaintiff was so excessive as to indicate that the jury had been moved by passion or prejudice.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 83; Dec. Dig. § 64.*]

4. DEATH (§ 99*)—DAMAGES—EXCESSIVENESS.

Decedent, a stone mason by trade, 47 years old and in good health, with ability to earn wages at from $6 to $6.50 per day, was killed while attempting to alight from defendant's moving electric car. He was a kind, affectionate father, and devoted most of his earnings to the support of his family. There was no evidence as to his habits of industry or sobriety, except that on the day he was killed there was evidence that he had spent the afternoon with a companion in a saloon playing cards and pool, and that, after they boarded the train, they were seen by fellow passengers drinking from a bottle. *Held*, that a verdict for $10,000 was excessive, and should be reduced to $6,000.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

Action by Susan E. Felt and others against the Puget Sound Electric Railway. On motion for new trial. Denied conditionally

Loveday, Kelley & McMillan, for plaintiffs.
B. S. Grosscup and W. C. Morrow, for defendant.

VAN FLEET, District Judge. This is an application by the defendant for a new trial in an action by the widow and minor children of Horace Felt, deceased, for damages resulting from the death of the latter, alleged to have been caused through defendant's negligence. The petition embraces several grounds, but only one was reserved for consideration—that the damages awarded by the verdict are excessive. The others, having been ruled against defendant at the argument, need not be further noticed here.

The verdict was for $10,000, and, as there was no foundation in the pleadings or evidence for exemplary or punitive damages and none such claimed, it must be assumed that the award was intended by the jury as purely compensatory in character. The claim of the defendant is that under the evidence as to the age of the deceased and his earning capacity, when regarded in connection with all the circumstances of the case, the verdict is without warrant, and could only have been given under the influence of passion or prejudice. The basis of this claim can best be disclosed by a brief statement of the material issues and the salient features of the evidence bearing thereon. At the time of the accident, plaintiffs' decedent was a passenger on an electric interurban train of defendant running between Seattle and Tacoma, proceeding to his home at Valley City, an intermediate waystation, and the particular acts counted upon as constituting negligence was the failure of the defendant "to maintain its train at a standstill for a sufficient and reasonable time to enable plaintiffs' decedent to alight therefrom in safety" at the latter point, and "in starting its said train after it came to a standstill with a sudden and violent jerk which threw plaintiffs' decedent under the wheels of said train." The defense was that the defendant was guilty of no negligence in the premises, but that the decedent's death arose solely and alone from his own negligence contributing directly and proximately thereto.

The evidence in behalf of the plaintiffs as to the circumstances of the accident tended to show that deceased and a companion boarded the train at Auburn to ride to Valley City, and, when they paid their fare, gave their destination to the conductor; that when the train approached the latter point it was dark; that no warning or notice was given by the train crew of the approach of the train to Valley City, and, when it reached that point, the train merely slowed down, but did not come to a full stop, or, if it did stop, it was but momentary, and immediately started on again; that several passengers who got off at that point had to step off while the train was moving; that deceased was seen to come to the exit of the smoking car in which he was riding after the train was in motion, but before it had passed the station platform, and that he tried to step or jump from the train to the latter, but fell or was thrown between the platform and cars and killed; that his hat was found on the platform about 12 feet from its south end (the direction in which the train was going), and flesh and blood and a bottle of whisky were found on the track about the same distance from the south end of the platform. The rate at which the train was moving at the time was left uncertain, but it was brought to a stop about 250 feet south of the station, and the deceased's body found resting on the forward truck of the second car.

On behalf of the defendant, the evidence tended to show that the deceased and his companion had spent the afternoon of the day in question in a saloon playing cards and pool, and that, after they boarded the train, they were seen by their fellow passengers drinking from a bottle; that when he took their fare the conductor announced the next station as Valley City, and, before it was reached, the brake-

man called out the station twice, and was heard by other passengers in the same car with deceased; that the train stopped at Valley City for the usual time—a minute or a minute and a half—and that five or six passengers, including two old ladies and three boys, got off safely and three men boarded it; that, as it was starting again, the deceased, who was still sitting in the smoker, was in the act of taking a drink from a bottle, when he jumped up with an exclamation, and started for the door; that his companion, a Mr. Gentry, followed him, and tried to prevent him leaving the moving train. What followed can best be given in the language of the witnesses.

Mr. Gentry testified:

"Q. Did you go with him? A. I stepped right behind him. Q. Did he get off? A. He jumped off; yes, sir. Q. Was the train moving at the time? A. Yes, sir. Q. What, if anything, did you do to prevent his getting off the car?

"The Court: State what occurred.

"A. I says: 'Let's not get off.'

"Mr. Kelley: I move to strike the answer.

"The Court: I will deny the motion.

"A. (continuing). I said: 'Let's ride her to the end before I will get off while the cars are running.' That is about all the effort I made to keep him from getting off. * * * Q. Where was the car at the time you told him, 'Let us ride it to the end'? A. It was at the platform. It was not clear by the platform, at the station. Had not left the platform entirely when I told him this.

"The Court: Or had not reached it?

"A. It had not left. It was going, but had not got to the south point of the platform.

"The Court: How's that?

"A. The train had started, but the platform reaches down quite a ways.

"Mr. Morrow: It was moving at the time? A. Yes, sir. Q. At what point was it that Mr. Felt jumped off? A. I cannot tell exactly. I did not take measurements, but I judge 10 or 12 feet from the south end."

Mr. Shillam, one of the parties who boarded the train at Valley City, gave this version:

"As we were waiting for the car, it pulled into the platform at Valley City, stopped about half way down the platform, and Mr. Bateman got on the car, Ray Miller and myself last, and as Mr. Bateman or Ray Miller opened the door —I do not know just which one it was—Mr. Felt was in the act of taking a bottle from his mouth, and just then as they opened the door, Mr. Felt said, 'My God. Dad, here's Valley City,' and with that he jumped up and passed me on the top step next to the platform of the car, and got down onto the bottom step, and I told him to 'Jump, jump,' but he did not do it immediately, as I told him, and maybe just a few seconds afterwards he made a jump and hung on the hand rail with his left hand, and that is all I know until the car stopped."

Charles Roberts, one of the boys who got off the train at Valley City, gave this graphic description of the accident:

"When we got to Valley City, we all got up as usual and walked down the aisle and got to the door, and waited until the car stopped, and we got off. Mrs. Simons was the first one off, and I do not remember whether I got off right afterwards or not. I know all three of us boys got off together, and after I got off and stood there, backing up against the railing to watch the car go, we saw Mr. Felt come out and start to get off. The brakeman saw him come out and seen he was going to jump, and he hollered: 'Don't jump, for God's sake;' but Mr. Felt did not pay any attention to him, and got down on the lower step and held on with his left hand, and jumped, and jumped all at once, and when he hit the platform the car had already got going fast enough so

that it jerked his hand, and his feet slipped, and then he dragged two or three feet, and then went down between the platform and the car."

The brakeman mentioned by the last witness testified that, after giving the signal to go ahead and stepping aboard the second car, he saw the deceased come to the door of the smoker, and he appeared to be intoxicated. The witness said:

"I jumped down to the bottom step because I saw he was going to get off. He grabbed hold of the hind handhold of the smoker and we were already going, and I made a grab for him. He dragged over the first cattle guard all right, and going across the road crossing I said, 'For God's sake, let go.' I knew he would not let go. I didn't know whether he was hurt at the first crossing or not, but I knew the second cattle guard on the other side would catch him, because they were built opposite to the first cattle guard, and I jumped for the emergency bell; but we run for, I guess, 150 feet before we stopped."

The witness further stated that when he gave the signal to go ahead he saw no one trying to get off; and did not see the deceased approaching the door of the smoker until after he had stepped aboard the second car.

The evidence for defendant as to the point of the accident and the finding of the deceased's hat and whisky bottle was not different from that shown by plaintiffs; and the only substantial conflict in the evidence as to the circumstances of the accident was on the question whether any notice was given by the train crew of the approach to Valley City, and as to whether the train stopped at that point for a reasonable period to allow passengers to alight with safety before proceeding on its way.

The evidence as to deceased's earning capacity and habits of life, while uncontradicted, was very brief and lacking of detail. It tended to show that he was 47 years of age, in good health, and a mason by trade; that he could earn wages of $6 to $6.50 per day, and was a kind and affectionate husband and father, and devoted most of his earnings to the support of his family. It was silent as to his habits of industry or as to his sobriety, except as indicated by the facts connected with the accident; and it failed to disclose whether he was employed at his trade at the time of his death or in some other occupation or at all, or how much his average earnings amounted to per year.

This is the case, in substance, upon which the jury were called to pass, and I find upon reviewing it fully that the impressions tentatively suggested by me at the oral argument of the motion are confirmed and have ripened into the conviction that the verdict rendered is without just foundation, and must have been dictated by other than a fair and impartial consideration of the evidence. I have not reached this conclusion lightly nor without a painstaking consideration of all the circumstances making in favor of the propriety of the verdict and of the able and ingenious presentation by plaintiffs' counsel in its support. Nor is there much difference in the main between counsel and myself as to the principles for which he contends. The difficulty lies in their application to the facts of this case, for each case is very largely controlled by its own peculiar circumstances. It is perfectly

true, as contended, that the question of the amount of the damages suffered, like that of negligence, is primarily one for the jury, but the very fact that the giving of excessive damages is made one of the grounds for which a new trial may be had negatives the idea that their judgment is to be regarded as infallible or conclusive; and yet to concede to the finding of the jury all that counsel claims for it in this respect would be to render that ground practically futile and meaningless, and of no avail. The rule undoubtedly is that the court should approach the subject of setting aside the verdict of the jury for a ground like this, involving the consideration of the evidence, with great care and proper reluctance; but, being fully satisfied that the jury have gone wrong, it is as much the duty of the court to intervene and correct that wrong in such an instance as in any other. As stated by Judge Story in Blunt v. Little, 3 Mason, 102, Fed. Cas. No. 1,578, in passing upon a similar motion:

"It is indeed an exercise of discretion full of delicacy and difficulty. But if it should clearly appear that the jury have committed a gross error, or have acted upon improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere to prevent the wrong as in any other case."

This duty indeed rests much more directly and imperatively upon the trial court than upon a court of review, since the latter is circumscribed and beset by many limitations which do not surround the former. The trial court has before it all the witnesses and instrumentalities of evidence at first hand, with at least the same facilities as the jury for reaching just conclusions on the facts; while the latter has but an inanimate record upon which to pass, fortified by the action of the trial court in denying the motion and confronted by the principle that every intendment and implication must be indulged in support of the judgment. The latter will therefore often hesitate where the trial court should not; and yet the instances are very numerous where the apppellate court has itself interfered to set aside or reduce an excessive verdict.

Having these principles in mind and with due regard for the considerations flowing therefrom which should cause the court to hesitate in the premises, it seems to me that in view of the very meager showing on the subject of the deceased's earning ability and the other elements properly to be considered in estimating the damage suffered by the plaintiffs, and considering that phase of the case alone, there is no escape from the conviction that in making the large award it did the jury ignored or went outside the evidence in the case. By no conceivable mode of just computation under the rule as to the measure of damages submitted to it could the jury have reached so large a result upon the facts before it. While, as stated, the evidence in this respect was uncontradicted, it left the deceased's earning capacity as based upon his habits of industry essentially lacking in certainty; and I know of no rule which will permit the jury to roam the field of conjecture or draw upon their imaginations for facts not disclosed by the evidence. It is said in effect that, conceding the lack in this respect, the jury were entitled to consider the loss of deceased's society, pro-

tection, and guidance, which is in its nature of uncertain value. But, while this is an element of loss, it is only its pecuniary, and not its sentimental, value; and it must have a limitation within reason as based upon the evidence. In that respect likewise the evidence was lacking in definite substance. The only evidence bearing upon the subject of deceased's personal habits related to the incidents of the day of the accident, and that, it is sufficient to say, was not of a character to justly influence the jury to so large a verdict.

These considerations are emphasized when we regard the very strong showing by the defendant tending not only to negative negligence on its part, but to show negligence by the deceased directly contributing to his death. It will be at once perceived that this evidence was of a character to bring the case close to the border line which would as matter of law preclude recovery by plaintiffs. It is said that this phase of the case should not be taken into consideration in passing upon the present motion; that the court, having refused defendant's motion for a nonsuit and for an instructed verdict, necessarily left the question of negligence to the jury, and neither that issue nor the evidence bearing upon it is now before the court. This is true only in part. While the issue of negligence so far as this court is concerned is thus settled by the ruling submitting it to the jury, the evidence upon which it rests is a part of the record for all that it tends to show; and the court not only may, but should, in passing upon the question whether the jury have been moved by passion or prejudice, look to every fact and circumstance in the case bearing either directly or indirectly upon the subject. For that purpose the evidence upon the question of negligence is properly here for consideration.

Upon the whole case, I am satisfied that the verdict should not be permitted to stand in its entirety; but I am not inclined, if it may be avoided, to put the parties to the expense and inconvenience of a new trial. I think the ends of justice may be better subserved by requiring a proper remission from the amount of the verdict. I have accordingly determined that, if the plaintiffs see fit within 10 days from notice of the entry of the order hereon to file a formal and sufficient stipulation agreeing to accept the sum of $6,000 and to a modification of the judgment to that sum, then a new trial will stand denied. If plaintiffs shall fail to make such remission within the time designated, or such further time as may be granted by a judge of this court, then a new trial will be, and is hereby, granted.

An order may be entered to this effect.